UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| VERN OLSON,<br><br>    Plaintiff,<br><br> vs.<br><br>CITY OF WINNER,<br><br>    Defendant. | 3:17-CV-03014-RAL<br><br><br>OPINION AND ORDER DENYING<br>MOTION FOR SUMMARY JUDGMENT |

Plaintiff Vern Olson (Olson) sued his former employer Defendant City of Winner (the City) alleging a violation of the Age Discrimination in Employment Act (ADEA), 29 US.C. § 621 *et seq.* Doc. 1. The City moved for summary judgment, Doc. 22, which Olson opposed, Doc. 37. For the reasons explained herein, this Court denies the City's Motion for Summary Judgement.

## I. Facts in Light Most Favorable to Olson

In ruling on the City's Motion for Summary Judgment, this Court must view the facts in the light most favorable to Olson as the non-moving party and resolve any genuine dispute of material fact in favor of Olson. Fed. R. Civ. P. 56; EEOC v. CRST Van Expedited, Inc., 679 F.3d 657, 686 (8th Cir. 2012). This Court of course is making no findings of fact in this Opinion and Order.

### A. The City's Governance Structure and Policies

This case concerns Olson's employment with the City and the cessation of that employment. The City is a rural municipality in South Dakota that is governed by an elected

mayor and six elected council members. Doc. 34-2 at 9.[1] The City employs approximately sixty-five people in ten departments, including a Street Department and a Parks/Cemetery Department. Doc. 35-18. Olson worked primarily for the Parks/Cemetery Department from May of 2010 to October 6, 2015. Doc. 34-2 at 42; Doc. 35-19 at 2.

The City departments are each supervised by a department head. Doc. 34-2 at 8–12. The department head of the Parks/Cemetery Department during Olson's employment was Calvin Cerv (Cerv). Doc. 25 at ¶¶ 1–2. The City's department heads report to the City Finance Officer, who serves as the City's human relations director. Doc. 34-2 at 8; Doc. 34-3 at 4. The City Finance Officer during Olson's employment was Rhonda Augspurger (Augspurger). Doc. 34-2 at 4. The City Finance Officer meets with department heads to go over the City Council meeting agenda and coordinate work duties. Doc. 34-2 at 9, 38.

The City Finance Officer typically contacts the Department of Labor to post the required advertisement for open positions when the City plans to hire a new employee. Doc. 34 at 12–13. The City Finance Officer collects applications, takes them to the department committee, and then the committee decides whom they want to interview. Doc. 34-2 at 10. The City Finance Officer also typically takes notes at the interviews and at council meetings. Doc. 34-2 at 10.

The City is governed by written personnel policies. Doc. 35-3. Because Olson argues that the City disregarded its policies in handling his employment and termination, and that it is evidence of pretense for age discrimination, pertinent parts of the policies are described herein. The first page of the City's Personnel Policy handbook states:

> The City Finance Officer is responsible for the administration of this policy and the practices and procedures stated herein shall be the established personnel policy for

---

[11] This Court cites to the page number in the CM/ECF system rather than to the page number contained on the document, which in the case of Doc. 34-2 are deposition excerpts.

all full-time employees of the City of Winner, with the exception of the Police Department, which has a personnel policy governing such employees.

All Department heads shall follow and enforce all the personnel rules and procedures as prescribed in the personnel manual.

Doc. 35-3 at 3.

The City has two equal employment opportunity policies. The first one states, in relevant part:

The City of Winner does hereby declare it is a fundamental policy of the City of Winner to provide equal opportunity to all of its employees and applicants for employment (skilled, unskilled and professional) and to assure that there shall be no discrimination against any person on the basis of . . . age . . . unless related to a bonified [sic] occupational requirement. To this end, the City of Winner will take steps to equalize opportunity for employment at all levels of denied equal opportunity; minority group members, women and the handicapped . . . .

All employees shall be afforded equal employment opportunity during their term of employment . . . .

All administrators and supervisors are responsible for and shall be committed to achieving and promoting an equal opportunity program.

Adoption of this document reaffirms the City of Winner's policy of non-discrimination in employment, including but not limited to the following: recruitment, selection, placement, testing, promotion, transfer, discipline, demotion, layoff and termination.

Doc. 35-3 at 5. The second "Non-Discrimination Policy" states, in relevant part, that "[n]o applicant for employment with the City of Winner shall be favored or discriminated against because of their . . . age . . . ." Doc. 35-3 at 6.

The City's hiring policy states:

Selection of the employee will be made by the governing body and the head of the department concerned prior to notification of that applicant. This shall pertain to all applicants, either for full time or seasonal employees.

The department committee and the department supervisor will review applications for employment.

The committee and supervisor will conduct interviews with selected applicants in order that recommendations may be made to the governing body for final approval

at their next regular meeting prior to notification of selected individual. This shall pertain to all applicants, either full-time or seasonal employees.

Doc. 35-3 at 5–6.

The City also has a seniority policy. Doc. 35-3 at 4. It states:

Seniority is defined as priority of employment to which a permanent full-time employee is entitled, by reason of length of service with the City. Seniority of any employee shall be established; including vacation, sick leave and other authorized leaves of absence taken since the date of employment.

Any and all seniority privileges shall be forfeited by the resignation or dismissal of an employee. Seniority shall be considered for promotional purposes, in computing years of service for the purposes of allowed annual leave, in determining prior selection of time for annual vacations and in other such situations as deemed advisable by the City.

Doc. 35-3 at 4.

The City's resignation policy requires that "[a]n employee is requested to give two weeks notice. Upon failure to give two weeks notice, accrued vacation leave shall not be paid." Doc. 35-3 at 11. Sick leave is also calculated with a two-week notice. Doc. 35-3 at 8.

The City's disciplinary policy provides that the City "shall exercise its right to discipline any employee only for good and just cause." Doc. 35-3 at 9. One of several forms of discipline is authorized, including an oral reprimand, which is described as follows: "A Department Head may discipline the employee by oral reprimand at any time. No written notice will be required and no record need be filed in the employee's file." Doc. 35-3 at 9. An oral reprimand is the most minor discipline a person can receive. Doc. 34-2 at 30. An oral reprimand does not have to be documented. Doc. 34-2 at 30. The City's policy for a written reprimand requires:

The Department Head will notify the employee in writing the reasons for the disciplinary action and a copy of the written notice, initialed by the employee, will be dated and placed in the employee's file. If the employee refuses to initial the notice, the Department Head to that effect shall make a notation.

Doc. 35-3 at 10.

The City's dismissal policy states:

> The decision to dismiss an employee is to be determined by the Department Head and the City Council. Dismissal proceedings will be taken when an employee's work, conduct or character are considered unsatisfactory. The employee is to be notified in writing of this dismissal and the reasons therefore, by the Department Head. The statement shall be initialed by the employee and dated and placed in the employee's personnel file. If the employee refused to initial the statement, the Department Head to that effect shall make a notation.

Doc. 35-3 at 10. It is the policy of the City "to ensure that all full time employees who voluntarily end employment with the City receive an opportunity for an exit interview . . . and an exit interview questionnaire." Doc. 35-3 at 12–13. The City provides a grievance procedure "to provide a just and equitable method for the resolution of grievances with discrimination, coercion, restraint or reprisal against any employee who may submit to be involved in a grievance." Doc. 35-3 at 10. However, employees "who voluntarily terminate their employment will have their grievances immediately withdrawn except where improper computation of wage and benefit payments are concerned." Doc. 35-3 at 11.

An employee's resignation can be rescinded up until the City Council meets and accepts the resignation. Doc. 34-2 at 43. City employees may seek to transfer into different jobs in different departments. Doc. 34-2 at 26.

**B. Olson's Employment with the City**

Olson was born in 1961 and was 54 years of age during the relevant time period of the summer and fall of 2015. Doc. 34-1 at 3. Olson was hired and began working for the City on May 24, 2010. Doc. 34-1 at 3; Doc. 36 at ¶ 1. Olson's job title was assistant supervisor of the Parks/Cemetery Department. Doc. 35-1 at 4–5. Olson also performed some duties for the Street Department during his employment in the Parks/Cemetery Department. Doc. 35-1 at 20–21.

The Parks/Cemetery Department head, Cerv, had a long history of working for the City, dating back to the 1980s, although he had left employment and returned to City employment

several times over the years. Doc. 35-1 at 3, 5. Cerv had recommended Olson to be the City's assistant supervisor of the Parks/Cemetery Department. Doc. 35-1 at 5. Cerv was responsible for evaluating Olson's performance and gave Olson "fairly decent" performance evaluations over the years, although those favorable evaluations, according to Cerv, "may have exaggerated" Olson's actual performance. Doc. 35-1 at 12, 20.

Cerv issued only one disciplinary action to Olson—a "verbal reprimand via a text" sometime in June or July 2015. Doc. 25; Doc. 25-1; Doc. 35-8. This disciplinary action was formally documented and presented to Olson on October 6, 2015, after Olson's employment was being terminated. Doc. 35-9; Doc. 35-10. Olson only had one other disciplinary action during his employment with the City—a verbal reprimand issued in 2012. Doc. 35-20.

From the City's perspective, Olson's job performance deteriorated in 2015, and Olson was sometimes argumentative, refused to do assigned work, and complained about his job and pay. Doc. 25 at ¶¶ 2–10; Doc. 25. There had been an incident where, contrary to Cerv's directive, Olson erected a fence that later was removed. Doc. 23 at ¶ 5; Doc. 25 at ¶ 6. Olson also cut down a tree he was not supposed to touch and demeaned young summer employees. Doc. 23 at ¶¶ 6–7; Doc. 25 at ¶¶ 7–8. Olson points to his record of favorable performance evaluations to contest the City's characterizations of these events. Doc. 36 at ¶¶ 5–7.

## C. Olson's Applications for Other City Jobs

Prior to July 2015, the City's Street Department head was Harlan Muhs (Muhs). Doc. 34-1 at 18–19. Olson had talked to Muhs about getting a job in the Street Department. Doc. 34-1 at 18. Olson recalls that Muhs "was under the assumption" that Olson's prospects for getting hired were not good because the City should be hiring younger people because so many of the current employees were over forty. Doc. 34-1 at 18.

6

On June 18, 2015, the City hired Bob Bolzer (Bolzer), its Street Department foreman under Muhs, to replace Muhs, who then retired on June 22, 2015. Doc. 35-2 at 3–4; Doc. 34-1 at 19; Doc. 36 at ¶¶ 19, 28. Bolzer was qualified for the position, and Olson makes no argument that the City acted improperly in hiring Bolzer as the Street Department head. Doc. 36 at ¶¶ 24–28. Bolzer's promotion left an open position in the City's Street Department. Doc. 36 at ¶ 29.

Rhonda Augspurger (Augspurger), an employee of the City since 2002, was the City Finance Officer/HR Director beginning in 2014. Doc. 34-2 at 3–4. Augspurger does not have decision making authority on employment matters, but works with department heads and the City Council on personnel matters, and presents information about employee performance in executive session together with proposals to the City Council about employment matters. Doc. 34-2 at 10, 38. Augspurger previously had sought to have the City Council increase Olson's pay, but the City Council declined to do so. Doc. 34-2 at 38–39.

To help fill open positions with the City, the mayor had appointed and the City Council had approved a Hiring Committee that consisted of three council members. Doc. 24; Doc. 36 at ¶¶ 20–21. Augspurger collected job applications, provided them to the Hiring Committee, and then the Hiring Committee decided whom to interview. Doc. 34-2 at 10. Olson asserts that the existence and operations of the Hiring Committee is at odds with City policy, that department heads are to be active participants in the hiring decision and review all applications, that the department head is supposed to make recommendations to the City Council, and that the department head is also supposed to have a say in interdepartmental job transfers.

As the new Street Department manager beginning in late June 2015, Bolzer talked to Augspurger about possibly transferring Olson from his existing Parks/Cemetery Department job into the open Street Department job. Doc. 35-2 at 9–10. In response, Augspurger told Bolzer she

would talk to the committee. Doc. 35-2 at 10. Olson learned that Bolzer wanted to hire Olson for the open Street Department position. Doc. 34-1 at 19.

On July 6, 2015, the City of Winner voted to advertise for the open Street Department maintenance worker position vacated by Bolzer. Doc. 35-4. The advertisement for the Street Department maintenance position listed these job requirements: "Must be 18 years old. Must have valid driver's license. Must have or be able to get a CDL[2] license. Heavy Equipment Experience preferred." Doc. 35-5. Olson met these qualifications for the advertised position. Doc. 35-2 at 11; Doc. 35-1 at 21; Doc. 34-3 at 28–30. The base pay for the Street Department position was almost $2.00 more per hour than Olson's Park/Cemetery Department job. Doc. 34-3 at 41; Doc. 35-5; Doc. 35-22.

Olson and four other people—Greg Bice (Bice), Melvin Mayes (Mayes), Jerrel Tyburec (Tyburec), and Travis Kubal (Kubal)—applied for the Street Department job. Doc. 34-3 at 29–32. Olson was the only City employee who applied for the position. Doc. 34-3 at 30. The City's seniority policy applies to promotions, preferencing a full-time permanent employee who has longer service with the City than another employee or applicant. Doc. 34-2 at 26–27; Doc. 34-3 at 28–30.

Olson did not get an interview for the Street Department position. Doc. 34-3 at 34. Bice, a former City employee who was qualified for the position, did not get an interview. Doc. 34-3 at 33–34. Bice was over forty at the time. Doc. 34-3 at 34. Mayes also had all of the qualifications for the position and was performing similar work as a Street Department worker for Tripp County, a job also based in Winner. Doc. 34-3 at 32–33. Mayes was over forty and did not get an interview,

---

[2] CDL is short for Commercial Driver's License.

though he had previously been interviewed in June of 2015 for the job filled by Bolzer. Doc. 34-3 at 32–34.

Tyburec did not have all of the qualifications in that he lacked a CDL or the preferred heavy equipment experience. Doc. 34-3 at 32. When this lawsuit started, Tyburec was thirty-one years old. Doc. 35-18 at 3. Kubal had a CDL and might have had some heavy equipment experience, and thus appears to have been qualified for the position. Doc. 34-3 at 33. Kubal was twenty-seven at the time this lawsuit started. Doc. 35-18 at 3. Neither Tyburec or Kubal had been an employee with the City at the time they applied for the City's Street Department position. Doc. 35-1 at 21. Even though Olson, Bice, Mayes, and Kubal were qualified applicants, the City reopened the advertisements for the Street Department maintenance worker position because it wanted to get more applicants, but no one new applied. Doc. 35-5; Doc. 34-3 at 30–31. Kubal and Tyburec— the only two applicants younger than forty—were the only applicants who got interviews. Doc. 34-3 at 33–35.

Though he was the Street Department head, Bolzer never saw the applications of Olson, Mayes, or Bice, nor was he consulted about those applications. Doc. 35-2 at 12–14. Bolzer only saw applications for those who were interviewed. Doc. 35-2 at 13. The Hiring Committee with some input from Augspurger selected who would be interviewed without the involvement of Bolzer, although City policy called for more involvement of the department head, in this case Bolzer. Doc. 35-2 at 6–7, 13–14; Doc. 35-3 at 4–5.

On September 21, 2015, the City hired Tyburec even though he lacked a CDL at the time. Doc. 35-2 at 13; Doc. 35-6. The City's expectation was that Tyburec would obtain a CDL, and he may have done so by October 23, 2015. Doc. 26 at ¶ 15; Doc. 26-4. The City maintains that Olson

did not get an interview in September of 2015 for the Street Department job because it was "aware of his employment with the City, and his generally poor job performance." Doc. 24 at ¶ 2.

### D. Cessation of Olson's Employment

Olson was upset that he was not interviewed for the Street Department job and spoke to the mayor. According to what Cerv has stated under oath, by the end of September, Cerv no longer wanted to work with Olson because of his deteriorating job performance, went to Augspurger about the situation, and at Augspurger's request wrote a note documenting a "verbal reprimand via a text" given by Cerv to Olson the previous June or July and the reasons therefore. Doc. 25; Doc. 25-1; Doc. 35-1. Doc. 25; Doc. 25-1; Doc. 35-8. However, when Olson later furtively recorded a conversation with Cerv, Cerv told Olson that Augspurger "for a month or better" had been telling Cerv that he needed to write up a report about the incident that led to a verbal reprimand. Doc. 35-13 at 2. According to Cerv, Augspurger told Cerv "'You got to get that written up. You got to get that written up. We got to get that in the file.'" Doc. 35-13 at 2. Augspurger acknowledges that she asked Cerv to submit this documentation and received it at the end of September even though it bears an earlier date corresponding to when the incidents leading to the reprimand occurred. Doc. 34-3 at 1–2. This written documentation of a reprimand was not presented to Olson, but was presented by Augspurger to the City Council on October 5, 2015. Doc. 34-3 at 1–9.

On October 5, 2015, the City had a meeting and went into executive session to discuss Olson's employment. Doc. 35-7. Cerv did not attend the October 5 City Council meeting, but Augspurger provided Cerv's handwritten reprimand of Olson to the City Council. Doc. 35-7; Doc. 35-8; Doc. 34-3 at 12, 15–17. Cerv's note does not recommend termination of Olson's employment, but Augspurger added additional comments attributed to Cerv to her presentation to

10

the City Council in executive session. Doc. 35-8; Doc. 34-3 at 12, 15–17. Augspurger testified that at the October 5 executive session, the City Council determined "to begin with" that Olson was going to be terminated. Doc. 34-3 at 12, 18. During the executive session, Augspurger suggested that Olson be given the option to resign before the termination to get paid for his unused sick leave and accrued vacation. Doc. 34-3 at 6, 12. The City Council adopted her idea and decided at the October 5 meeting that Olson would be terminated if he did not submit a resignation before the October 14 meeting. Doc. 34-3 at 6, 12. Augspurger testified that the City Council further directed her to type up a letter for her and Olson to sign to be consistent with City policy. Doc. 34-3 at 24–25. The October 5, 2015 minutes reflect twenty-one minutes in executive session for a personnel issue, but do not record anything about what was discussed or decided. Doc. 35-7.

On October 6, 2014, Augspurger typed up Cerv's note in a document that she dated July 1, 2015, though this document was not typed or in existence until October 6. Doc. 35-9; Doc. 34-3 at 8. Augspurger's typed version adds several matters not included in Cerv's handwritten note, such as: "Therefore I am recommending that [Olson] resign or be put on suspension with no pay until the Council meets in a special counsel meeting on Wednesday October 14, 2015 and at that time they can decide on termination." Doc. 35-9; see Doc. 35-8. At the time Augspurger typed this document, she knew that the City had already determined that Olson would be terminated if he did not resign. Doc. 34-3 at 6, 8, 12. Cerv signed the document on the morning of October 6 at or after a staff meeting. Doc. 34-3 at 11; Doc. 35-9.

According to what Cerv said when being secretly recorded by Olson, Cerv was unaware Olson was going to be fired before Augspurger told Cerv on October 6, 2015, that "they wanted to fire you and they give me the job to do it. So that's when I drove out to the cemetery and talked

11

to you about it." Doc. 35-13 at 2. Cerv found Olson at work on a mower and said that he had bad news for Olson: Olson was going to be terminated if he didn't resign. Doc. 34-1 at 10–11. Cerv said that if Olson would resign, Olson would get his vacation and sick leave. Doc. 34-1 at 10–11. Cerv testified that Olson was upset and made a threat that he was going to get a gun and "shoot them all up," but Olson considers 99% of what Cerv said about the conversation to be a lie. Doc. 35-1 at 13; Doc. 34-1 at 10.

Olson then went to the City office at around 10:30 a.m. and met with Augspurger. Doc. 34-1 at 12. From what Olson recalls, Augspurger said he was being terminated for insubordination and the incident with summer help. Doc. 34-1 at 12. Olson protested this as "bull" and Augspurger responded that she was out of it, that is what the City Council decided, and that is the way it was. Doc. 34-1 at 12–13; Doc. 34-3 at 39. She told him that his name would not be in the paper as being fired if he resigned. Doc. 34-3 at 39. Olson then went and cleaned out his locker. Doc. 34-1 at 13.

According to what Olson later secretly recorded Cerv to say, Augspurger then called Cerv and had him come back to her office to sign a "list of allegations" that she had typed up. Doc. 35-13 at 2. Cerv reported that Augspurger said,

> "Can you come up here to the office because Vern's supposed to be here about 4:30." She said, "You might need to sign some stuff or whatever." So I get back up there and that list of allegations were on that paper, that had already written up. I read it and sat there.

Doc. 35-13 at 2–4. Cerv told Olson that he was about as surprised as Olson was about the things that he read in what Augspurger had typed up. Doc. 35-13 at 4. Cerv told Olson that "[t]hey threw me under the bus when them allegations, all those allegations—I didn't have you on that. Some of that's their allegations." Doc. 35-13 at 2. Cerv told Olson that the only information he had

12

turned in on Olson was because he was "forced into it" and that he was as "out of this loop" as Olson was. Doc. 35-13 at 2, 4.

Olson, Cerv, Augspurger, and the City Attorney met on October 6 at the City Office around 4:45 p.m. Doc. 34-1 at 13. At this meeting, Olson asked what the reasons for the termination were and, according to Olson, the City Attorney said that does not apply at this time, that the reasons would come out later and that Olson should resign to receive his benefits because if he didn't, Olson wouldn't receive them. Doc. 34-1 at 14. Augspurger then showed Olson the typed disciplinary document and said that if he did not resign, he would be terminated. Doc. 34-1 at 14. Doc. 35-10. Augspurger admits that she did not follow City disciplinary procedures in addressing the written reprimand with Olson short of termination, but believes that she did not need to follow the City's discipline policy because Olson chose to resign. Doc. 34-3 at 25, 37–38.

Olson's unused sick leave and vacation at stake were worth about $1,300. Doc. 34-1 at 10. Olson wrote out a resignation note and handed it to Augspurger. Doc. 34-1 at 13–14. It stated: "I Vern Olson am resigning on October ___, 2015," because Olson was contemplating a two-week notice period. Doc. 35-11; Doc. 34-1 at 14–15; Doc. 34-3 at 18. Augspurger crossed out Olson's date in Olson's presence and filled in October 6 as the date of the resignation. Doc. 35-11; Doc. 34-1 at 15. Augspurger explained that she changed the date to an immediate resignation so that Olson could get paid for his unused sick and vacation leave, even though the City's written policies require a two-week notice to qualify for those benefits. Doc. 34-1 at 15; Doc. 35-3. Olson did not get an exit interview even though that is one of the policies for employees who resign. Doc. 34-2 at 35–36.

On October 9, 2015, Olson attempted to rescind his resignation through a grievance that he filed with an employee in the City Finance Officer's department. Doc. 35-12. The grievance

stated: "I Vern Olson am filling [sic] a grievance about my forced resignation. I was mis-informed and mis-led by my supervisor, city finance officer and city attorney. [Signed] Vern Olson 10-9-2015." Doc. 35-12. The City never addressed Olson's grievance because the City believed that resigned employees have no right to a grievance. Doc. 34-2 at 34–35. Augspurger does not recall getting Olson's grievance even though it was received by the City on October 9, 2015. Doc. 34-2 at 34; Doc. 34-3 at 20–22. Augspurger did not take it to the City Council and does not know where it went. Doc. 34-2 at 34; Doc. 34-3 at 21–22. On October 14, 2015, the City voted to accept Olson's resignation. Doc. 35-14.

After his termination in October 2015, Olson went to the City shop to visit with Cerv about his termination and to secretly record their conversation. Doc. 34-1 at 17; Doc. 35-13. Cerv said that if Olson would not have resigned, the City was going to fire him. Doc. 35-13 at 2. When Olson asked Cerv if Cerv had wanted Olson fired, Cerv stated: "No. No. Shit, no, I didn't want you fired, but my hands are kind of tied behind my back." Doc. 35-13 at 2. Cerv told Olson that Cerv would hire Olson back "in a heartbeat." Doc. 35-13 at 2. Cerv testified that he was lying to Olson during part of the taped conversation including when he told Olson that he did not want him fired. Doc. 35-1 at 13–14. However, Cerv said he truthfully told Olson that the first time he heard about Olson's termination was at the staff meeting the day following the October 5 City Council meeting. Doc. 35-1 at 18.

### E. Replacement Hired for Olson

After the cessation of Olson's employment, the City did not advertise Olson's open position. Doc. 34-3 at 43; Doc. 35-14 at 4. On October 19, 2015, the City Council voted to hire Kubal to fill Olson's position as a Parks/Cemetery worker. Doc. 35-14 at 4. The City Attorney advised that the City Council did not need to advertise the position because "we just interviewed

14

Travis for another position." Doc. 35-14 at 4; Doc. 35-1 at 23. Kubal is more than twenty years younger than Olson and had not worked for the City, but was offered Olson's Parks/Cemetery Department job at a pay rate of $15.20 an hour when Olson had been paid $13.76 for the same job. Doc. 34-3 at 41; Doc. 35-5; Doc. 35-14 at 4; Doc. 35-18 at 3; Doc. 35-22.

Within months after Kubal was hired, Kubal was transferred to the Street Department and Tyburec was transferred to the Parks/Cemetery Department. Doc. 35-1 at 22–24; Doc. 35-2 at 17. Bolzer and Cerv discussed doing this exchange between the two departments they ran for the City because Bolzer needed a truck driver in his department and Tyburec apparently was still doing testing for his CDL. Doc. 35-1 at 23; Doc. 35-2 at 22. When Bolzer asked about the transfer of Tyburec and Kubal, the City Council said "yes" and they basically switched the department timecards. Doc. 35-1 at 24; Doc. 35-2 at 17–18.

### F. The City's Subsequent Explanations for Olson's Termination

There were no reasons for Olson's termination documented in his personnel file. Doc. 34-3 at 23. After Olson applied for unemployment insurance benefits, on October 23, 2015, Augspurger wrote to the South Dakota Department of Labor:

> The employee had been disciplined in the past, but again had violated policies including insubordination, neglect of duty, offensive or inconsiderate conduct toward fellow employees while on duty, refusal or failure to perform job assignments and loitering during work time. His supervisor was intending to recommend the employee's termination, but the employee submitted his written resignation before any action was taken.

Doc. 35-15.

On October 28, 2015, Augspurger submitted a further statement to the South Dakota Department of Labor to oppose Olson's unemployment benefits application. Doc. 35-16. This time, Augspurger asserted that Olson had asked for vacation with short notice on September 23, 2015, and complained about his rate of pay, putting the Parks Department in a bind for work that

was scheduled. Doc. 35-16. Augspurger added, "it was after this happening that [Cerv] came to me and I took this information to the City Council they were aware of the things that have happened in the past and they have had concerns about other things this year." Doc. 35-16. Olson was on approved leave between September 23-25 and September 27-October 1, 2015. Doc. 35-16. Augspurger, however, admits that Olson's September leave was asked for and granted according to City policy and was not a reason for his termination. Doc. 34-3 at 14. When asked why she represented that Olson had been terminated for taking vacation according to City policy or resigning without clarifying that he was told he was terminated first, Augspurger testified that she did not have to provide the Department of Labor with the reasons for Olson's termination because they were discussed by the City in executive session and added that she was not under oath when responding to the Department of Labor. Doc. 34-3 at 17. On November 4, 2015, the South Dakota Department of Labor denied Olson's application for unemployment benefits apparently based on Augspurger's factual representations, writing "You were discharged because you threatened to quit your job if you didn't get a raise." Doc. 35-17.

## II.     Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). On summary judgment, courts view "the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." CRST Van Expedited, Inc., 679

16

F.3d at 686 (quoting Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011)). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). The Eighth Circuit has held in an en banc decision that there is no "'discrimination case' exception to the application of summary judgment[.]" Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc). Thus, this Court applies the same summary judgment standard to discrimination cases as it does to all others.

## III. Discussion

### A. ADEA

The ADEA forbids discrimination against employees, age forty and over, because of their age. 29 U.S.C. §§ 623(a)(1), 631(a). To prove his claim under the ADEA, Olson must show by a preponderance of the evidence that age was the "but-for" cause of the adverse employment action. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009) ("[T]he plaintiff [in an ADEA case] retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action."); Buehrle v. City of O'Fallon, 695 F.3d 807, 813 (8th Cir. 2012) ("Under the ADEA standard, a plaintiff must 'establish that age was the "but-for" cause of the employer's adverse action.'" (quoting Gross, 557 U.S. at 177)). Olson may have his ADEA claim survive summary judgment "either by providing direct evidence of discrimination or by creating an inference of unlawful discrimination through the McDonnell Douglas [Corp. v. Green, 411 U.S. 792 (1973)] analysis."[3] Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 953 (8th Cir. 2012). Olson

---

[3] The Supreme Court explained in Gross that it has not definitively decided whether the McDonnell Douglas framework applies in ADEA cases. Gross, 557 U.S. at 175 n.2. Nevertheless, the Eighth Circuit has continued to apply the framework in ADEA cases. See Tusing v. Des Moines Indep.

acknowledges that he lacks direct evidence of discriminatory animus and instead argues his case under the McDonnell Douglas framework. Doc. 37 at 4.

## B. McDonnell Douglas Standard

Under the burden-shifting framework set forth in McDonnell Douglas, Olson has the initial burden of establishing a prima facie case of age discrimination by showing he: "(1) was at least forty years old; (2) suffered an adverse employment action; (3) was meeting his employer's legitimate expectations at the time of the adverse employment action; and (4) was replaced by someone substantially younger." Gibson v. Am. Greetings Corp., 670 F.3d 844, 856 (8th Cir. 2012) (quoting Morgan v. A.G. Edwards & Sons, Inc., 486 F.3d 1034, 1039 (8th Cir. 2007)). If Olson establishes a prima facie case, then the burden of production shifts to the City to proffer legitimate, nondiscriminatory reasons for its actions. Onyiah v. St. Cloud State Univ., 684 F.3d 711, 719 (8th Cir. 2012). If the City meets this burden, Olson must show that the proffered reasons were a pretext for age discrimination. Id. Olson at all times retains the "ultimate burden of persuasion that 'age was the "but-for" cause'" of the City's adverse action. Id. (quoting Rahlf v. Mo-Tech Corp., 642 F.3d 633, 637 (8th Cir. 2011)).

Olson was at least forty years old at all relevant times, including when his employment with the City ceased. Olson was then replaced by Kubal and then Tyburec, both of whom are substantially younger than Olson. Thus, there is no debate about the first and fourth elements of the McDonnell Douglas test.

The City resists somewhat whether Olson "suffered an adverse employment action" under the second prong of McDonnell Douglas. The City maintains that it did not terminate Olson, but

Cmty. Sch. Dist., 639 F.3d 507, 515 (8th Cir. 2011) (upholding the continued applicability of the McDonnell Douglas framework after Gross).

that Olson voluntarily resigned. However, the City Council decided on October 5, 2015, in executive session that if Olson did not resign, he would be fired. Doc. 34-3 at 6, 12, 18. Olson wrote and signed a resignation letter on October 6, 2015, only after being told that if he did not resign he would be fired and would lose entitlement to sick leave and vacation benefits worth approximately $1,300. Doc. 34-1 at 10, 14–15. Olson did not start the work day of October 6, 2015, with it in mind to resign; it was not Olson's idea or desire to resign that day. Indeed within days of October 6, 2015, Olson filed a grievance seeking to withdraw his resignation, which the City disregarded. Doc. 34-3 at 20–22; Doc. 35-12. "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." Thomas Corwin, 483 F.3d 516, 528–29 (8th Cir. 2007) (quoting Wedow v. City of Kan. City, Mo., 442 F.3d 661, 671 (8th Cir. 2006)). The City confronting Olson with the option to resign or be fired and lose benefits is an adverse employment action.

The principal question under the initial part of the McDonnell Douglas framework is whether Olson "was meeting his employer's legitimate expectations at the time of the adverse employment action." Gibson, 670 F.3d at 856. The performance evaluations Olson had received were "fairly decent" in the words of his department head, but that same department head testified that he "may have exaggerated" Olson's actual performance in those evaluations. Doc. 35-1 at 12, 20. The actual writeup of any issues with Olson's work performance occurred only as the decision was being made to terminate him or request his resignation in lieu of termination. Another City department head had wanted to hire Olson earlier that year, and Olson had received just a single informal reprimand prior to the time of his termination. Doc. 35-2 at 9–10; Doc. 35-8. Viewing the facts in the light most favorable to Olson as this Court must in ruling on the City's summary

judgment motion, Olson has come forward with sufficient facts at the summary judgment stage to shift the burden of production under the McDonnell Douglas framework.

## C. The City's Proffered Reason for Olson's Termination of Employment

Because Olson has established a prima facie case of age discrimination under the initial part of the McDonnell Douglas framework the burden shifts to the City to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Onyiah, 684 F.3d at 719. The burden to articulate a nondiscriminatory reason is not onerous. Buchholz v. Rockwell Int'l Corp., 120 F.3d 146, 150 (8th Cir. 1997); see also Krenik v. Cty. of Le Sueur, 47 F.3d 953, 958 (8th Cir. 1995) ("This is a burden of production not proof. The defendant need not persuade the court, it must simply provide evidence sufficient to sustain a judgment in its favor.").

The City maintains that the termination occurred because Olson's job performance had deteriorated in 2015. Drawing from Cerv's report in October of 2015 and the typed document prepared by Augspurger on October 6, 2015, the City proffers the following reasons for terminating Olson:

1) Mr. Olson was very difficult to deal with when it came to giving him orders or directions with regard to his work. He was argumentative about most things, and he would sometimes not do the work he had been assigned, especially if Cerv was absent after giving him a list of jobs to perform.

2) Mr. Olson complained frequently, often about City policies, and the way things were done in the City's operations. He also complained frequently about his hourly rate of pay, and stated he would only do what he was getting paid for, and nothing more. On one occasion, Mr. Olson told Cerv that he (Olson) went to the local bait shop and complained to his friends about his wages and about how stupid City management was.

3) Mr. Olson was insubordinate to Cerv, not only arguing about things, but going so far as doing things I had told him not to do. As one example, Mr. Olson had commented that there should be a fence at a City playground, and he wanted the fence installed as an irritant to the homeowner. His primary motivation for wanting the fence was he was mad at the homeowner who lived next to the playground. Cerv told Olson not to put

up the fence at that location. A short time later, Cerv discovered that Olson had put up the fence despite Cerv's order not to. Cerv made sure the fence was taken down and removed.

4) On more than one occasion, Olson also cut down a tree that he was told not to, simply because he didn't like where the tree was located. The tree was at the back edge of a City softball field.

5) Mr. Olson was responsible for supervising summer help, generally young men of the approximate age of 18. He showed absolutely no leadership skills in dealing with these employees, and some of his language and behavior were inappropriate. He once made a derogatory comment about the weight of one somewhat overweight young man, while in the presence of the young man and the other summer help. After getting into an argument with one of the summer employees, he "chest bumped" one of the employees, in order to make his point and show his authority. Mr. Olson admitted to Cerv he had "done something stupid" in that regard.

6) Mr. Olson regularly complained about being asked to help out with other city Departments when they needed extra help, a common practice among City departments, street, water, and park/cemetery. When asked to help out with another department, he tried to avoid doing the work. If the work involved a task Mr. Olson didn't want to perform, he simply did whatever he could to avoid doing that task. On one occasion, when City employees were dealing with a water main break, and their department was helping with that situation, Olson kept looking for a reason to leave so he would not have to be involved in the work.

7) Mr. Olson yelled at one of the other parks employees for calling Cerv with a question, on an occasion when Cerv was not on duty. That employee had phoned Cerv about a work-related matter. Mr. Olson seemed to be offended that the other worker had "gone over his head" to call Cerv.

8) On another occasion, in July of 2015, prior to going on vacation, Cerv gave Olson a list of tasks to be completed by the department, while Cerv was on vacation. After Cerv's return, virtually none of the tasks had been performed.

9) Cerv had given Olson numerous verbal reprimands throughout these situations, yet he never improved in his job performance. While Cerv believed Olson had the necessary ability to be a good worker, his attitude and belligerence prevented him from being a satisfactory employee.

Doc. 28 at 1–3. The City has satisfied its burden to proffer a legitimate, nondiscriminatory reason for the adverse employment action against Olson.

**D. Pretext**

Because the City has proffered legitimate, nondiscriminatory reasons for terminating Olson's employment, the burden shifts back to Olson under the McDonnell Douglas framework to establish pretext. Although there are multiple ways to demonstrate pretext, plaintiffs typically do so by offering evidence that the employer's rationale is "unworthy of credence . . . because it has no basis in fact" or that "a [prohibited] reason more likely motivated the employer." Torgerson, 643 F.3d at 1047 (alteration in original) (quoting Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006)). To survive summary judgment at this stage, Olson must "present evidence, that considered in its entirety (1) creates a fact issue as to whether [the City's] proffered reasons are pretextual and (2) creates a reasonable inference that age was a determinative factor in the adverse employment decision." Tusing v. Des Moines Indep. Cmty. Sch. Dist., 639 F.3d 507, 516 (8th Cir. 2011) (quoting Wingate v. Gage Cty. Sch. Dist., No. 34, 528 F.3d 1074, 1079 (8th Cir. 2008)).

Olson has come forward with sufficient evidence to create genuine issues of material fact as to whether the City's proffered justification for terminating Olson was mere pretext. Olson had continuously worked as a City employee since 2010 with the Parks/Cemetery Department. The City had policies for performance evaluations and reprimands. Olson had received fairly good evaluations and only one informal reprimand prior to October of 2015. Evidence of prior positive performance evaluations is relevant when considering possible pretext. See Guimaraes v. SuperValu, Inc., 674 F.3d 962, 975 (8th Cir. 2012) ("'[E]vidence of a strong employment history will not alone create a genuine issue of fact regarding pretext and discrimination,' but it 'can be relevant when considering whether the record as a whole establishes a genuine issue of material fact.'" (quoting Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1020 (8th Cir. 2005))). Of

course, positive performance evaluations may not be dispositive of the existence of pretext. See Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1137–38 (8th Cir. 2006) ("While favorable performance reviews sometimes provide evidence of pretext, . . . we agree with the district court that receipt of positive reviews in the past, in and of itself, does not necessarily raise an inference of age discrimination." (internal quotation marks and citations omitted)); Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1109 (8th Cir. 1998) (explaining that while employee's performance evaluations may demonstrate that employee performed well in the past, they did "not render her more recent negative evaluations inherently untrustworthy"). The head of the Street Department had wanted to hire Olson and have him transfer to the Street Department earlier in 2015. The proffered justifications for terminating Olson were not presented to Olson in the ordinary course of performance evaluations, but only formalized initially in Cerv's handwritten note on October 5 and then typed by Augspurger after the City Council meeting of October 5 when the City was intent on terminating Olson's employment. Viewed in the light most favorable to Olson, Olson's fairly good performance evaluations,[4] the dearth of documentation concerning Olson's performance problems before October of 2015, and the failure by the City to inform Olson of the same are evidence of possible pretext. See, e.g., Lloyd v. Ga. Gulf Corp., 961 F.2d 1190, 1195 (5th Cir. 1992) ("We have very recently held that, when an employer's stated motivation for an adverse employment decision involves the employee's performance, but there is no supporting documentation, a jury can reasonably infer pretext."); Stanfield v. Answering Serv., Inc., 867 F.2d 1290, 1294 (11th Cir. 1989) (finding that lack of disciplinary reports in employee's file and lack

---

[4] The absence of poor performance evaluations of course does not itself suffice to prove pretext. See Hague v. Thompson Distrib. Co., 436 F.3d 816, 826–27 (7th Cir. 2006).

23

of verbal complaints about her work habits supported a reasonable jury's conclusion that the company's articulated reasons for terminating employee was a pretext for age discrimination).

The City's apparently shifting explanations for terminating Olson suggest pretext as well. See Loeb v. Best buy Co., Inc., 537 F.3d 867, 873 (8th Cir. 2008) ("Pretext may be shown with evidence that the employer's reason for the termination has changed substantially over time."); Elam v. Regions Fin. Corp., 601 F.3d 873, 881 (8th Cir. 2010) ("While '[s]ubstantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext, this does not mean that an employer cannot elaborate on its proffered reason.'" (quoting Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 855 (8th Cir. 2005))). The City's proffered reason in short is that Cerv, Olson's department head, had multiple issues with Olson's performance and no longer wished to work with Olson, took his issues with Olson to Augspurger who in turn advised the City Council which decided to terminate Olson's employment if he would not resign. But Cerv, perhaps untruthfully, denied to Olson involvement in Olson's termination and told Olson he was surprised and was forced into it. Doc. 35-13. Augspurger gave a differing and seemingly untrue explanation of the grounds for Olson's termination to the South Dakota Department of Labor, prompting the Department of Labor to believe that Olson was fired for threatening to quit if he did not get a raise. Doc. 34-3 at 14–17; Doc. 35-15; Doc. 35-16; Doc. 35-17. Here there are sufficiently conflicting explanations from the City to cast doubt on the proffered reason for the adverse employment action.

A showing of pretext is not by itself sufficient to avoid summary judgment. Gibson, 670 F.3d at 856. Olson also must show that the facts permit a reasonable inference that his age was a determinative factor in the City's decision to terminate him. Id. Of course, this does not necessarily mean that Olson must introduce additional evidence of discriminatory animus beyond

his prima facie case and evidence of pretext. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147–48 (2000). In certain circumstances, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." <u>Id.</u> at 148.

Olson has some evidence that could permit a trier of fact to infer that Olson's age was a factor in the City's decision making. The City had a seniority policy which it seemingly ignored when Olson applied in 2015 for the Street Department job. Although the Street Department head had proposed having Olson transfer to the Street Department, the City chose not only to advertise the position, but also to interview none of the three applicants over forty years of age. The thirty-one-year-old who was hired for the Street Department lacked the required CDL and ultimately was transferred to a different City job—Olson's old job with the Parks/Cemetery Department. Though admissibility of the statement at trial might be debatable, an outgoing City department head supposedly had shared with Olson his impression that Olson's prospects for getting the Street Department job were slim because the City had so many employees over forty and needed to hire younger people. The person hired to fill Olson's position was twenty-seven years of age and was offered a starting salary higher than what Olson had earned.

Olson may not have a strong case that the City engaged in age discrimination and indeed there appears to be no direct evidence of age discrimination. However, viewed in the light most favorable to Olson, there is enough evidence under the <u>McDonnell-Douglas</u> frameworks to create a fact question for the jury.

**IV.    Conclusion and Order**

For the reasons explained, it is hereby

25

ORDERED that the City's Motion for Summary Judgment, Doc. 22, is denied. Counsel is to cooperate with the Court's judicial assistant to set a pretrial conference and trial date in this case.

DATED this 12th day of August, 2019.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE